## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ENCOMPASS HOME AND AUTO INSURANCE COMPANY (a/k/a ENCOMPASS HOME & AUTO INS. CO.) as subrogee of ELIZABETH BROWN and THOMAS BROWN<br>2775 Sanders Rd.<br>Northbrook, IL 60062-6127 | CIVIL ACTION No:<br><br><br><br>JURY TRIAL DEMANDED |
| Plaintiff, |  |
| v. |  |
| AMAZON.COM, INC.<br>410 Terry Avenue<br>Seattle, WA 98109-5210 |  |
| Defendant. |  |

## COMPLAINT

### PARTIES

1.      Plaintiff, Encompass Home and Auto Insurance Company (a/k/a Encompass Home & Auto Ins. Co.) ("Plaintiff" or "Encompass"), as subrogee of Elizabeth Brown and her adult son, Thomas Brown, is an Illinois corporation with a principal place of business located at 2775 Sanders Road, Northbrook, Illinois 60062.  At all times relevant hereto, Plaintiff was duly authorized to issue contracts of insurance in the Commonwealth of Pennsylvania.

2.      Defendant, Amazon.com, Inc. ("Amazon") is a corporation duly organized and existing under the laws of the State of Delaware.  Amazon's

principal place of business is located at 410 Terry Avenue, Seattle, Washington 98109.

## **VENUE AND JURISDICTION**

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim that is the subject of this action occurred in the Middle District of Pennsylvania.  In addition, the defective product at issue damaged real property located in this district.

4.      Jurisdiction is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

5.      This Court has personal jurisdiction over Amazon because it:

(a)      regularly conducts business in Pennsylvania;

(b)      markets to residents of Pennsylvania;

(c)      packaged, shipped and/or sent the product at issue into Pennsylvania; and

(d)      Plaintiff's claims arise out of or are related to Amazon's activities in Pennsylvania.

## **FACTS**

6.      Amazon is an e-commerce company that, among other things, provides an internet-based marketplace for the sale of products.

20231529v.1

7.     When it adopted 15 U.S.C. § 8401, the United States government stated that "[t]he Internet has become an important channel of commerce in the United States, accounting for billions of dollars in retail sales each year," that "[c]onsumer confidence is essential to the growth of online commerce" and that, "the Internet must provide consumers with clear, accurate information."

8.     In 2016, Amazon filed a Form-K with the Securities and Exchange Commission stating that Amazon's sales were $135,987,000,000.00.

## AMAZON'S RELATIONSHIP WITH VENDORS

9.     Through its internet-based marketplace, Amazon, among other things, allows third-party vendors to use its e-commerce website to offer and sell products.

10.     Amazon markets to and recruits third-party vendors to sell products through its website based on purported customer confidence in the Amazon brand.

11.     Amazon requires all third-party vendors seeking to sell products through its website to sign a document entitled:  "Amazon Services Business Solutions Agreement" and agree to its terms.

12.     Pursuant to the Amazon Services Business Solutions Agreement, Amazon provides third-party vendors a suite of merchant services Amazon refers to as "Selling on Amazon," "Amazon WebStore" and "Fulfillment by Amazon." All of these services are detailed in the Amazon Services Business Solutions Agreement, hereinafter referred to, collectively, as "ASBSA."

13.     Amazon represents to third-party vendors using its website that they can boost their product visibility on the Amazon website platform by using fee-based, keyword-targeted, advertising.

14.     Amazon allows third-party vendors using its website to bid on keywords and choose from a variety of ad placements.

15.     One of the products third-party vendors offer for sale on Amazon's internet site are computer batteries.

16.     Pennsylvania residents searching for products such as computer batteries on either the internet or on Amazon's website can, after identifying that the batteries are available for purchase on Amazon's website, purchase batteries through Amazon's website.

17.     When Pennsylvania residents search for computer batteries on Amazon's website, Amazon identifies products available for purchase to Amazon's website users not in random order, but in the order established by Amazon's search algorithm.

18.     In exchange for a fee paid to Amazon by a third-party vendor, Amazon places the third-party vendor's products higher in its user search results.

19.     One of the companies that sold products through Amazon's website marketplace was Lenoge Technology (HK) Limitd ("Lenoge"), a Hong Kong-

based company that sold products, including computer batteries, through the fictitiously-named "E-Life" storefront.

20.    Upon information and belief, Lenoge signed an ASBSA with Amazon on December 4, 2012.

21.    When Lenoge signed the ASBSA, Amazon agreed to provide merchant services to Lenoge that included "Selling on Amazon," "Amazon Webstore" and "Fulfillment by Amazon" services.  Hereinafter, Fulfillment by Amazon Services are referred to as "FBA" services.

22.    Upon information and belief, in addition to signing the ASBSA, Lenoge signed up for Amazon's "Sponsored Products" program, whereby, in exchange for a fee, Amazon placed Lengoe's product advertisements on different parts of Amazon's website.

23.    Pursuant to the ASBSA, Lenoge agreed to grant Amazon a license to use, adopt, re-format, create derivative works of, and otherwise exploit the company's trademarks, product information, data and materials.

24.    Under the ASBSA, Amazon required Lenoge to provide "accurate and complete Required Product Information," including disclaimers and warnings to Amazon.

25.    Under the ASBSA, Lenoge gave Amazon the right to control and determine the content and appearance of Lenoge's product listings.

20231529v.1

26.     Under the ASBSA, Amazon required Lenoge to list its products on Amazon's website at prices "at least as favorable to Amazon users as the most favorable terms upon which the product is offered and/or sold" via other sales channels.

27.     Under Amazon's FBA program, vendors send their products to Amazon's fulfillment centers and Amazon stores the products in its ready-to-ship inventory.

28.     When an Amazon user places an order for a product, such as a computer battery, that is part of the FBA program, Amazon handles all packaging and shipping for the product.

29.     When Amazon ships products through the FBA program, Amazon ships the products in boxes or containers stamped with Amazon's name and/or logo on them.

30.     When Amazon ships products through the FBA program, Amazon uses shipping tape on the shipping boxes and/or containers that is stamped with either the words "Amazon" or "Amazon Prime."

31.     Amazon provides customer service for products sold through its FBA program, including handling product returns.

32.     When it provides customer service, Amazon allows users to interact directly with Amazon customer service agents.

33.     Pursuant to the ASBSA, Amazon required Lenoge to provide goods that were suitable for sale.

34.     If Amazon determined that a Lenoge product was an Unsuitable Unit because it created a safety, health or liability risk to Amazon or to any third party, Amazon was authorized by Lenoge to return or discard the item.

35.     Under the terms of the ASBSA, an "Unsuitable Unit" is defective.

36.     Amazon provides an "A-to-z Guarantee" for products sold through its website under which it guarantees Amazon users' purchases from third-party vendors such as Lenoge.

37.     Amazon's A-to-z Guarantee guarantees the condition of products sold through Amazon's website.

38.     Amazon guarantees that products sold through its website are not defective.

39.     Amazon offers its A-to-z Guarantee to allow Amazon customers to buy products through its website with confidence.

40.     Under the ASBSA, Lenoge agreed to indemnify Amazon for any claims or losses arising from or related to the sale of Lenoge's products.

41.     Under the ASBSA, upon reaching a defined "Insurance Threshold," Amazon required Lenoge to maintain liability insurance naming Amazon.com as an additional insured.

42.     Upon information and belief, at all times material hereto, Lenoge's sales through Amazon's website reached the Insurance Threshold.

43.     Amazon takes no proactive steps to determine whether vendors satisfy the Insurance Threshold and procure the insurance mandated by Amazon's ASBSA.

44.     Although Amazon guarantees the condition of products sold through its website, Amazon does not require vendors selling products on its website to have a United States agent for service of legal process nor does it require vendors to identify product manufacturers.

45.     Amazon charges third-party vendors, such as Lenoge, who sell products through Amazon's website, various fees.

46.     Amazon's fees for vendors in the FBA program include an "FBA Order Handling Fee," an "FBA Pick & Pack Fee," and "FBA Weight Handling Fee" (collectively "Logistics Fees") and a fee Amazon calls a "Referral Fee on Item Price" ("Referral Fee").

47.     In addition to the FBA handling, pick and pack fees and the Referral Fee, Amazon charges vendors in the FBA program a monthly storage fee for products stored in Amazon's fulfillment centers.

48.     Amazon charges its vendors a "Referral Fee" for the advantages of selling their products on Amazon.com.

49.    Amazon's "Referral Fee" is a sales commission.

50.    Amazon's "Referral Fee" includes a "Sales Referral Fee," a "Per Sale Closing Fee" and a payment processing fee Amazon calls a "Variable Closing Fee."

51.    Payment for all sales made through the Amazon website must be processed through the Amazon website.

52.    Amazon charges its vendors a "Referral Fee" even if the vendor is not part of the FBA Program.

53.    Amazon uses part of the Referral Fee to pay for marketing activities designed to bring users to Amazon's website.

54.    Upon information and belief, pursuant to Amazon's FBA program, Lenoge sent laptop batteries, including the battery at issue, to an Amazon fulfillment center and Amazon stored the batteries.

## THE PURCHASE OF THE BATTERY AND THE FIRE

55.    At all times material hereto, Plaintiff's insured, Elizabeth Brown ("E. Brown") owned a duplex located at 838 Lake Redman Court, Seven Valleys, Pennsylvania.

56.    E. Brown lived in the duplex with her adult son, Thomas Brown ("T. Brown").  T. Brown owned a laptop computer.

20231529v.1

57.    George Brown ("G. Brown"), another son, lived in the other one-half of the duplex with his wife, Kathleen Brown ("K. Brown").

58.    Upon information and belief, on July 21, 2016, G. Brown or K. Brown ordered a replacement battery for T. Brown's laptop computer from Lenoge using Amazon's website.  See Order Details (Exhibit A).

59.    Amazon charged G. Brown or K. Brown $12.15 for the battery, including shipping and handling.

60.    Amazon charged Lenoge Logistics Fees, a Referral Fee and a payment processing fee related to the sale.

61.    Alternatively, Amazon charged Lenoge a Referral Fee and a payment processing fee related to the sale.

62.    Upon information and belief, Amazon packaged and shipped the battery for E-Life pursuant to its FBA program.  Amazon shipped the battery to K. Brown at 848 Lake Redman Ct., Seven Valley, Pennsylvania.

63.    Alternatively, E-Life shipped the battery to K. Brown after it was purchased through Amazon's website.

64.    After K. Brown received the battery, T. Brown installed it in his laptop computer.

65.    On May 3, 2017, T. Brown left the laptop computer in his bedroom at E. Brown's home and left the residence.

66.     Later in the day, the battery overheated and ignited.  The resulting fire caused extensive damage to E. Brown's home and the contents within the home.

67.     On the date of the fire, Encompass insured E. Brown's home.

68.     After the fire, E. Brown and T. Brown submitted a claim to Encompass seeking policy benefits.  Encompass adjusted the claim and made payments to or on behalf of its insured(s) in an amount in excess of $ 92,000.00.

69.     Pursuant to the terms of the insurance policy and the applicable law, Encompass is conventionally and/or equitably subrogated to its insured's rights and claims against third parties, including Amazon, responsible for causing the fire.

## COUNT I – NEGLIGENCE

70.     Plaintiff hereby incorporates the averments contained in the preceding paragraphs as if set forth fully herein.

71.     Amazon was in the business of selling and/or supplying products for use or consumption by the public.

72.     Since 2012, Amazon had an on-going relationship with Lenoge.

73.     Amazon, through its use of search algorithms, product placement algorithms and/or its paid product placements, specifically undertook to have a role in what battery G. Brown or K. Brown selected for purchase.

74.     When users search for products on Amazon's website, the results list highlights products Amazon identifies as "Amazon's Choice" products.

75.     When Amazon users order products using one of Amazon's voice command products such as Amazon Alexa, Amazon Echo or Amazon Echo Dot, Amazon, among other things, selects "Amazon's Choice" products for the user and asks the user if Amazon should place the order.

76.     When Amazon Prime users order products using one of Amazon's voice command products such as Amazon Alexa, Amazon Echo or Amazon Echo Dot, Amazon, among other things, selects "Amazon's Choice" products for the user and asks the user if Amazon should place the order.

77.     Amazon, using its own selection criteria, selects the products that are identified as "Amazon's Choice" products.

78.     When users search for but do not order products during the same visit to the Amazon website, Amazon sends emails to the user recommending products to the user for purchase.

79.     Among the features Amazon offers its users are lists of products detailed under a "Recommended for You" tab on Amazon's webpage.

80.     Amazon makes recommendations to its users based on, among other things, a user's previous ratings, product reviews, likes and/or purchases.

-12-

81.     Amazon allows users to improve the list of Amazon-recommended products by providing users an "Improve Your Recommendations" tab.  On this tab on the Amazon website, users can refine Amazon's recommendations "by rating or adjusting the checkboxes."

82.     When users search for a product on Amazon's website, the search results include products Amazon recommends to the user.

83.     When users search for a product on Amazon's website, the search results page includes items that Amazon refers to as "featured recommendations" inspired by the user's browsing history.

84.     When users search for a product on Amazon's website, the search results page includes items that Amazon refers to as "featured recommendations" inspired by the user's purchases.

85.     When Amazon processed the sale of the battery at issue, it guaranteed the condition of the battery.

86.     Amazon marketed the battery for sale, stored the battery for distribution, distributed the battery and placed it into the stream of commerce.

87.     When Amazon supplied the battery, it was in a defective condition, unreasonably dangerous to users or consumers of such batteries.

88.     Plaintiff's insured(s) used the computer battery in the manner it was intended to be used.

89.     The battery at issue was dangerous beyond the reasonable consumer's contemplations as the battery's defective condition was unknowable and unacceptable to the average consumer.

90.     The battery at issue was unreasonably dangerous and in a defective condition because the probability and seriousness of the harm caused by the product outweighed the burden or costs of taking precautions to make the product safe or warn of its latent dangers.

91.     When the fire occurred, the battery was in the same condition it was in when it left the manufacturer's, and Amazon's, control.

92.     Amazon knew or should have known - based on prior overheating and/or fire incidents with respect to similar laptop computer batteries sold by Lenoge, a company that Amazon knew was located in Hong Kong - that these batteries were defective.

93.     Amazon, who, among other things:

(a)     created an international e-commerce website;

(b)     required vendors such as Lenoge to give Amazon a license to use and modify its materials, including the vendor's product information, data and materials;

(c)     required vendors to provide product information, including warnings;

(d)     had the right to control and determine the content and appearance of

product listings;

(e)     required vendors to provide suitable goods, i.e. goods that were not

defective and safe for use by third parties;

(f)     took possession of the products, including the battery, subject to its

FBA program;

(g)     received a Referral Fee on the sale of the battery;

(h)     stored, packed and shipped the battery and received fees for providing

logistics and storage services;

(i)     provided customer service for the battery it packaged and shipped;

and

(j)     provided a guarantee against defective products and required vendors

to provide insurance for liability arising from defective products,

had a duty to warn individuals who may reasonably use products sold through its

website, or whose property may be injured by such products, of the defective and

unreasonably dangerous condition of the product.

94.     Amazon, who guaranteed that laptop batteries sold on its website were

not defective, had a duty to exercise reasonable care to ensure that batteries sold by

third-party vendors were not defective.

95.     Amazon, who created an e-commerce marketplace, marketed and/or recommended products to users, provided logistics services for a fee and who received a Referral Fee (a.k.a. sales commission) for each FBA sale made through its website, owed the Browns, including E. Brown and T. Brown, a duty to exercise reasonable care in marketing, packing, distributing or otherwise placing the battery into the stream of commerce.

96.     Amazon failed to exercise ordinary care with respect to marketing, packing, distributing, supplying or otherwise placing the battery into the stream of commerce by:

(a)     failing to market, pack, distribute, supply or otherwise place into the stream of commerce a properly functioning battery;

(b)     failing to test, inspect or examine the battery to ensure that it was in proper working order and/or a suitable unit prior to placing it into the stream of commerce;

(c)     failing to test, inspect or examine the battery to ensure that it was not susceptible to overheating and fire;

(d)     failing to market, pack, distribute, supply or otherwise place the battery into the stream of commerce in a safe and working manner so as to avoid the risk of fire;

(e)     placing the battery into the stream of commerce when Amazon knew or should have known that it contained unreasonably dangerous defects in materials, design and/or workmanship, or without an adequate warning, which thereby rendered it unsafe for its ordinary and expected use;

(f)     guaranteeing that the battery would not be defective so that its users could "buy with confidence" but failing to exercise reasonable care to ensure that the product was sold by storefront against whom Amazon's users (i.e. customers) could recover;

(g)     guaranteeing that the battery would not be defective so that its users could "buy with confidence" but failing to exercise reasonable care to ensure that third-party vendors who met the Insurance Threshold provided liability insurance from which consumers or users injured by products sold through Amazon's website could recover; and

(h)     guaranteeing that the battery would not be defective so that its users could "buy with confidence" but failing to exercise reasonable care to ensure that the battery was manufactured by a manufacturer against whom Amazon's users could recover for their injuries.

97.     The malfunction of the battery was of a kind that ordinarily occurs as a result of a product defect and was not the result of causes other than the product

defect existing at the time Amazon marketed, packed, distributed, supplied or otherwise placed the battery into the stream of commerce.

98.     Both Amazon's negligence and the defective battery were substantial factors, i.e. proximate causes, of the fire and the damages suffered by Plaintiff's insureds, including damage to their real and personal property and extra expenses that amounted to a sum in excess of $92,000.

WHEREFORE, Plaintiff demands judgment in its favor and against Amazon for damages in an amount in excess of $92,000, together with interest and costs of suit and such other relief as the court deems just and proper.

## COUNT II – PRODUCTS LIABILITY

99.     Plaintiff hereby incorporates the averments contained in the preceding paragraphs as if set forth fully herein.

100.    Amazon sold, distributed, packed, marketed, supplied and/or placed the battery into the stream of commerce.

101.    The battery was defective and unsafe for its ordinary and intended use in that:

(a)     it was prone to malfunctions that caused electrical overheating and fire;

(b)     it was designed in a way that created an unreasonable risk of overheating and fire;

(c)     it was unsafe for use with the HP laptop computer model for which Amazon marketed, packed, distributed or otherwise placed the battery into the stream of commerce;

(d)     the battery was not accompanied by warnings advising users or consumers as to the means by which they could mitigate or avoid the hazards associated with the battery; and

(e)     the battery was not accompanied by warnings advising users or consumers as to the nature of the battery's hazards.

102.   The malfunction of the battery was of a kind that ordinarily occurs as a result of a product defect and was not the result of causes other than the product defect existing at the time Amazon marketed, packed, distributed, supplied or otherwise placed the battery into the stream of commerce.

103.   The battery was in a defective and unreasonably dangerous condition when it left the possession and control of Amazon and was expected to, and did, reach the user or consumer without substantial change in condition.

104.   The battery's defective and unreasonably dangerous condition was a substantial factor, i.e. proximate cause, of the fire and the damages suffered by Plaintiff's insureds, including damage to their real and personal property and extra expenses that amounted to a sum in excess of $92,000.

WHEREFORE, Plaintiff demands judgment in its favor and against Amazon for damages in an amount in excess of $92,000, together with interest and costs of suit and such other relief as the court deems just and proper.

## COUNT III – MISREPRESENTATION – RESTATEMENT OF TORTS § 402B

105.   Plaintiff hereby incorporates the averments contained in the preceding paragraphs as if set forth fully herein.

106.   At all times material hereto, Amazon was in the business of selling, marketing, distributing and/or supplying products sold through its website.

107.   Amazon knew that, when it handled the sale of the battery at issue, the vendor providing the battery for sale had an @gmail address, not an email address ending with @lenoge.com.

108.   When Amazon handled the sale of the battery, it guaranteed the condition of the battery, guaranteeing that the battery was not defective.

109.   When Amazon handled the sale of the battery, it misrepresented the character or quality of the battery.

110.   Amazon knew or should have known that users or consumers of products purchased through Amazon's website could not recover damages from either Lenoge, a foreign entity operating under a fictitious name with a non-Lenoge email address, or the unknown product manufacturer.

20231529v.1

111.    Amazon, who received, upon information and belief, Logistics Fees, a Referral Fee and a payment processing fee related to the sale of the battery, misrepresented that customers could "buy with confidence" from Amazon's website.

112.    Upon information and belief, G. Brown and/or K. Brown purchased the battery, and passed the battery on to T. Brown, in reliance on Amazon's misrepresentations about its guarantee and users' ability to "buy with confidence."

113.    Amazon's misrepresentations were a substantial factor, i.e. proximate cause, of the fire and the damages suffered by Plaintiff's insureds, including damage to their real and personal property and extra expenses that amounted to a sum in excess of $92,000.

WHEREFORE, Plaintiff demands judgment in its favor and against Amazon for damages in an amount in excess of $92,000, together with interest and costs of suit and such other relief as the court deems just and proper.

WHITE AND WILLIAMS LLP

BY: <u>s/ William L. Doerler</u>
    William L. Doerler, PA81898
    Christopher Konzelmann, PA58927
    1650 Market Street | One Liberty
    Place, Suite 1800 |
    Philadelphia, PA 19103-7395
    Phone: 215.864.7000
    Fax: 215.789.7636
    konzelmannc@whiteandwilliams.com
    doerlerw@whiteandwilliams.com
    Attorneys for Plaintiff
    Encompass Home and Auto Insurance
    Company (a/k/a Encompass Home &
    Auto Ins. Co.)


Dated:  February 28, 2018